OPINION OF THE COURT
 

 Levine, J.
 

 The People appeal, pursuant to permission granted by a Justice of the Appellate Division, from an order of that Court reversing a judgment of conviction of defendant of murder in the second degree, of weapons and cocaine possession and of tampering with physical evidence, and granting defendant’s motion to suppress physical evidence and his incriminating statements.
 

 The People make two arguments on their appeal. First, they argue that, contrary to the conclusion of the Appellate Division, the requirement of a founded suspicion of criminal activity does not apply when the police seek consent to search a vehicle following a stop for a traffic violation
 
 (see, People v Hollman,
 
 79 NY2d 181;
 
 People De Bour,
 
 40 NY2d 210). In the alternative, the People argue that, assuming the
 
 De Bour-Hollman
 
 standard applies and results in the invalidation of the consent search conducted by the State Police here, the Appellate Division mistakenly rejected, as a matter of law, application of the inevitable discovery doctrine to all of the incriminating evidence obtained by the police emanating from the search.
 

 We conclude that the first argument, having not been preserved, is beyond the jurisdiction of this Court. Unlike the trial courts and the Appellate Division, this Court’s jurisdiction is limited to issues of law and, with extremely limited exceptions (none of which is applicable here), issues that have not been preserved in the trial court are beyond our power of review. As to the second argument, the People timely proposed to the trial court the application of the inevitable discovery doctrine as an alternative ground for denial of defendant’s suppression motion. Hence, that question is preserved and properly before us. We conclude that the Appellate Division
 
 *81
 
 erred in rejecting, as a matter of law, any application of the inevitable discovery doctrine to this case.
 

 I
 

 The charges against defendant arose out of a 2:00 a.m., November 20, 1990 State Police traffic stop, for a speeding violation, of the U-Haul rental van defendant was driving. At the time of the stop, defendant was heading west on Route 17 less than a mile beyond the Thruway Woodbury toll plaza in Orange County. During that stop, a consent search of the van was conducted by the police, leading to the discovery of the body of a murder victim, later identified as Fernando Cuervo, in a steamer trunk located in the rear of the van. The State Troopers testified at the suppression hearing that, after stopping the van, they asked defendant to consent to a search because the hunting season had opened the previous day and "[djuring hunting season we have problems with people hunting deer at night without licenses, carrying loaded weapons in their car, a van, just curious what they had in the back.”
 

 Supreme Court found that defendant readily expressed his willingness to permit the search of the rental van as part of a "preconceived strategy” to allay any suspicions and to distract the officers from any intensive search which might lead them to inspect the steamer trunk. When, nevertheless, the search unearthed Cuervo’s body in the trunk, defendant fled. He was shortly apprehended by one of the troopers and he and the other two occupants of the van were taken to the State Police barracks in Monroe. There, one of the troopers issued defendant traffic tickets for speeding and seat belt violations and ran a computer check on the status of his operator’s license. When this revealed that defendant’s license was under suspension, another summons was issued for aggravated unlicensed operation of a motor vehicle. The troopers then ascertained that neither of defendant’s companions in the van possessed a valid operator’s license.
 

 Defendant was briefly interrogated by a State Trooper at about 3:30 a.m. at the police barracks, after being advised of his
 
 Miranda
 
 rights. His initial statement was exculpatory as to the murder of Cuervo. At about 8:00 a.m., a New York City detective began interrogating defendant. Defendant continued to maintain his innocence until, about an hour later, he was confronted with information one of his companions disclosed to another officer, that Cuervo had been murdered at an apartment on Ninth Avenue in Manhattan, leased and sometimes
 
 *82
 
 occupied by defendant. It was then that defendant verbally admitted killing Cuervo by shooting him and striking him with a hammer. At some later point in the interrogation defendant responded to a question concerning his drug-dealing activities with a request to see a lawyer. Based upon information given by the defendant before he asked for a lawyer, and upon information obtained from defendant’s two confederates, thé police obtained search warrants for two apartments used by defendant. Using the same information, a police diver was successful in retrieving the gun used in the killing from the Hudson River, where it had been discarded when defendant and his companions began their journey upstate to dispose of the body. The apartment searches resulted in the seizure of inculpatory evidence of the murder and of firearms and a large quantity of cocaine.
 

 Following his indictment, defendant moved to suppress his statements and the physical evidence seized by the police. His moving papers alleged that the search of the U-Haul rental van took place
 
 after
 
 traffic tickets were issued, and was conducted
 
 without
 
 his consent. He asserted that his subsequent statements and any evidence seized through the search warrants obtained by the police should be suppressed as being the "result of the [initial] illegal search.”
 

 Defendant’s posthearing memorandum in support of the motion to suppress argued that the consent to search the rental van was involuntary as based upon overbearing police conduct under all of the circumstances, that his postarrest statements were the fruit of the illegal search, and that the People’s invocation of the inevitable discovery doctrine to avoid suppression should be rejected. The People’s responding memorandum set forth arguments rebutting defendant’s claim that the consent to search was involuntary and that his statements were inadmissible, and asserted that, even if the consent to search was found to have been coerced, the People’s evidence was admissible under the inevitable discovery doctrine.
 

 Supreme Court found that defendant’s consent to the search of the rental van and its contents was given voluntarily. Consequently, the court denied suppression of all of the physical evidence, and of defendant’s inculpatory statements made before he invoked his right to counsel near the end of the police interrogation. Upon the conclusion of the jury trial that followed, defendant was convicted as charged.
 

 On defendant’s appeal, the Appellate Division did not disturb Supreme Court’s finding of the voluntariness of the consent to
 
 *83
 
 the search of the rental van. It held, nonetheless, that the consent was invalid because the police lacked a founded suspicion "that criminal activity was afoot so as to give rise to the common-law right to inquire
 
 (People v De Bour
 
 [40 NY2d 210, 215]) and
 
 justify the request to search (People v Hollman
 
 [79 NY2d 181, 195])” (219 AD2d 383, 387 [emphasis supplied]). The Court also rejected, as a matter of law, the application of the inevitable discovery doctrine to all of the incriminating evidence obtained by the police, which the Court concluded had resulted from the illegal consent search of the rental van.
 

 II
 

 As noted, the People’s first point is that the Appellate Division should not have applied the
 
 De Bour-Hollman
 
 level-two common-law right to inquire standard for police-civilian street encounters to a valid vehicle stop for a traffic violation. However, the necessity of a founded suspicion of criminal activity before the troopers were justified in requesting defendant’s consent to search the rental van, under
 
 De Bour
 
 and
 
 Hollman,
 
 was never raised before the suppression court. Consequently, the purely legal question of the necessity of a founded suspicion of criminal activity as a predicate for the troopers to seek permission to search the rental van was an unpreserved issue on the appeal to the Appellate Division. Indeed, the People made that very point before that Court.
 

 Nor was preservation of that question of law regarding the application of the
 
 De Bour-Hollman
 
 standard to traffic violation stops established pursuant to CPL 470.05 (2). That subdivision deems a question of law raised on appeal to have been preserved "if in response to a protest by a party, the court
 
 expressly decided [that] question
 
 raised on appeal” (emphasis supplied). The suppression court’s allusion to the subjective suspicions of the troopers in seeking to search the rental van was made in a context of a description of the events and factors leading to and bearing upon defendant’s voluntary consent. Thus, the court’s statements were made in response to defendant’s claim of involuntariness of his consent, the sole ground for challenging the consent advanced by defendant in his posthearing memorandum on the motion to suppress. The reference to the state of mind of the troopers was also juxtaposed with the court’s discussion of the practice of the State Police, in conjunction with the State Department of Environmental Conservation personnel, to seek authority to search vehicles for violation of hunting laws and regulations
 
 (see,
 
 ECL 71-0525 [1] [b]).
 

 
 *84
 
 Nowhere in its decision did the suppression court "expressly decide” that the request for consent to search was
 
 justified
 
 by a
 
 founded
 
 suspicion of criminal activity, or even, that a founded suspicion was the appropriate standard for a consent vehicle search. Thus, the equivocal references by the suppression court to the troopers’ suspicions of hunting law violations, on a claim totally unrelated to any
 
 De Bour-Hollman
 
 infirmity, did not establish that the issue concerning a founded suspicion of criminal activity
 
 necessary
 
 to justify the troopers’
 
 request
 
 for permission to search was expressly "decided by the hearing court upon appropriate protest”, and preservation was not established under CPL 470.05 (2)
 
 (People v Johnson,
 
 83 NY2d 831, 834).
 

 As the foregoing demonstrates, the applicability of the
 
 De Bour-Hollman
 
 founded suspicion standard for a request for consent to search following a valid traffic stop was not preserved before the Appellate Division as an issue of law. Therefore, the Appellate Division’s resolution of the question in favor of the defendant was made pursuant to its discretionary interest of justice review powers
 
 (see,
 
 CPL 470.15) and is beyond our power of review
 
 (see,
 
 CPL 450.90 [2] [a];
 
 People v Johnson,
 
 47 NY2d 124, 127). As this Court held in
 
 People v Cona
 
 (49 NY2d 26, 33):
 

 "Unlike the Court of Appeals, the Appellate Division as an intermediate court of review has broad power to review questions of fact and discretion as well as questions of law
 
 (see,
 
 CPL 470.15, 470.30). Hence, the Appellate Division, if it deems it appropriate, may exercise its discretionary power to review alleged errors even in the absence of that timely objection which is necessary to create a question of law. Where the Appellate Division exercises this discretion, however, and reverses a conviction on the basis of an issue not preserved, its order is then grounded at least in part upon the exercise of that discretion and is thus not appealable to this court.”
 

 Ill
 

 Alternatively, the People argue that the Appellate Division erred in rejecting the inevitable discovery doctrine. This issue was preserved by the People’s submission on the point at the suppression hearing. The Appellate Division’s holding thus
 
 *85
 
 constitutes a determination on a question of law, and renders the order appealable because, but for the Appellate Division’s purely legal determination to reject entirely the People’s position on inevitable discovery, it would not have reversed and granted full suppression of all the incriminating evidence
 
 (see,
 
 CPL 450.90 [2] [a];
 
 People v Giles,
 
 73 NY2d 666, 668).
 

 We conclude that the Court erred in deciding, as a matter of law, that none of the evidence having any nexus to the consent search of the rental van could be admissible under the inevitable discovery doctrine. That doctrine is one of three general exceptions to the application of the exclusionary rule to "fruits of the poisonous tree,” the others being attenuation and independent source (5 LaFave, Search and Seizure § 11.4 [a], at 234 [3d ed]). We first recognized the inevitable discovery exception to the exclusion of evidence "tainted” by illegal police procedures in
 
 People v Fitzpatrick
 
 (32 NY2d 499,
 
 cert denied
 
 414 US 1033). As stated in Fitzpatrick:
 

 "evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine
 
 where the normal course of police investigation
 
 would, in any case, even absent the illicit conduct, have inevitably led to such evidence” (32 NY2d, at 506,
 
 supra
 
 [emphasis supplied]).
 

 The Court in
 
 Fitzpatrick
 
 was not dissuaded by the objections of some commentators that the inevitable discovery doctrine would undermine the deterrent effect of the exclusionary rule.
 
 Fitzpatrick
 
 recognized that " 'if properly administered [the test for application of the inevitable discovery rule] denie[s] * * * the government the use of evidence [obtained by exploitation of illegality] and at the same time minimizes the opportunity for the defendant to receive an undeserved and socially undesirable bonanza’ ”
 
 (id.,
 
 at 507 [quoting Maguire,
 
 How To Unpoison the Fruit
 
 — The
 
 Fourth Amendment and the Exclusionary Rule,
 
 55 J Crim L, Criminology & Police Sci 307, 317])
 

 Similarly, the Supreme Court in
 
 Nix v Williams
 
 (467 US 431) noted, on the one hand, that the exclusionary rule is designed to deter constitutional violations by insuring that "the prosecution is not * * * put in a better position than it would have been in if no illegality had transpired”
 
 (id.,
 
 at 443). As a corollary, the Court continued, a properly balanced application of the exclusionary rule "ensures that the prosecu
 
 *86
 
 tion is not put in a
 
 worse
 
 position simply because of some earlier police error or misconduct”
 
 (id.,
 
 at 443 [emphasis in the original]). The inevitable discovery doctrine, like the independent source exception to the exclusionary rule, serves that balancing purpose of not over penalizing the prosecution and, thus, the Court felt justified in adopting.it as another exception to the exclusionary rule
 
 (id.,
 
 at 444).
 

 In applying the inevitable discovery exception, we require the prosecution to demonstrate a "very high degree of probability” that normal police procedures would have uncovered the challenged evidence "independently of [a] tainted source”
 
 (People v Payton,
 
 45 NY2d 300, 313,
 
 revd on other grounds
 
 445 US 573,
 
 on remand
 
 51 NY2d 169). In
 
 People v Stith
 
 (69 NY2d 313) we held as a matter of State constitutional law (NY Const, art I, § 12;
 
 see, People v Stith, supra,
 
 at 316, n) that primary evidence, i.e., the "very evidence * * * obtained during or as the immediate consequence” of the illegal conduct, would still be subject to exclusion even if it would most likely have been discovered in the course of routine police procedures (69 NY2d, at 318,
 
 supra).
 
 However, we recognized that the inevitable discovery exception can validly apply to permit the use of secondary evidence, obtained as a result of information gleaned from or by other exploitation of, the tainted primary evidence
 
 (id.,
 
 at 319;
 
 see also,
 
 5 LaFave,
 
 op. cit.,
 
 § 11.4, at 231-232).
 

 In the instant case, the prosecution introduced evidence at the suppression hearing that the contents of the stéamer trunk — Cuervo’s body and the hammer used in the murder— would inevitably have been discovered in an inventory search of the van that would have been conducted as a mandated, normal police procedure in the absence of the consent search. There is considerable authority for applying the inevitable discovery doctrine when the proof demonstrates that evidence obtained illegally would certainly have fallen lawfully into the hands of the police in the course of a constitutionally valid inventory search routinely conducted under the circumstances presented
 
 (see, United States v Woody,
 
 55 F3d 1257 [7th Cir],
 
 cert denied
 
 516 US 889;
 
 United States v Zapata,
 
 18 F3d 971 [1st Cir];
 
 United States v Seals,
 
 987 F2d 1102 [5th Cir],
 
 cert denied
 
 510 US 853;
 
 United States v Perea,
 
 986 F2d 633 [2d Cir];
 
 United States v George,
 
 971 F2d 1113 [4th Cir];
 
 State v Badgett,
 
 200 Conn 412, 512 A2d 160,
 
 cert denied
 
 479 US 940;
 
 Commonwealth v O’Connor,
 
 406 Mass 112, 546 NE2d 336). "Circumstances justifying application of the 'inevitable discovery’ rule are most likely to be present * * * where the circum
 
 *87
 
 stances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later” (5 LaFave,
 
 op. cit.,
 
 § 11.4 [a], at 249-250).
 

 Here, the troopers who stopped the defendant’s rental van for speeding testified that: (1) had defendant refused the request for consent to the search of the vehicle, an operator’s license check would necessarily have been performed at the scene of the stop, which would have revealed within a matter of minutes that defendant’s license was suspended; (2) if, as proved to be the case here, no other occupant of the vehicle had a valid operator’s license, standard New York State Police policy embodied in regulations required arresting the driver, returning him to the barracks with an opportunity to post bail, and impounding the vehicle
 
 (cf.,
 
 Vehicle and Traffic Law § 511-b [the statutory mandate for impounding a vehicle under these circumstances]); and (3) following impoundment, an inventory search of the vehicle and all of its contents, including closed containers, was similarly mandated.
 

 The foregoing evidence, if credited by the suppression court, could have established to that court’s satisfaction first, that, in the absence of the consent search, a constitutionally valid, nonpretextual inventory search of the van and its contents undoubtedly would have been conducted by the troopers
 
 (see, Colorado v Bertine,
 
 479 US 367, 372-374;
 
 People v Gonzalez,
 
 62 NY2d 386, 390-391;
 
 cf., People v Galak,
 
 80 NY2d 715). Based upon such a finding, the suppression court could have further found the existence of a very high degree of probability that the body of Cuervo would have been discovered through that inventory search and that, following the discovery, incriminating secondary evidence, i.e., evidence not obtained during or as the immediate consequence of the invalid consent search
 
 (see, People v Stith, supra),
 
 would also have been obtained by the police.
 

 Because the suppression court ruled in the People’s favor on defendant’s challenge to the voluntariness of the consent to search, the court did not proceed to resolve the factuál issues regarding the People’s alternative position in opposition to the motion to suppress, based on the inevitable discovery doctrine. The People should be entitled to an initial determination by the suppression court of the factual questions raised by their invocation of the inevitable discovery rule, based upon the evidence adduced at the suppression hearing
 
 (cf., People v Giles,
 
 73 NY2d 666,
 
 supra).
 

 
 *88
 
 Contrary to the Appellate Division’s analysis, our conclusion that the prosecution’s proof could afford a factual basis for the application of the inevitable discovery doctrine to secondary evidence here is not foreclosed because the license check was not made by the troopers prior to seeking defendant’s consent to search the van. Indeed, if the troopers’ testimony was credited, had they first conducted the license check, a valid search could have been conducted without consent, thereby eliminating any need for the People to resort to the inevitable discovery exception. Finally, contrary to the view of the Appellate Division, our decision in
 
 People v Stith (supra),
 
 as we have already discussed, would not preclude the introduction of secondary evidence here under the inevitable discovery exception to the exclusionary rule.
 

 Accordingly, the order the Appellate Division should be modified, by remitting to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Ciparick and Wesley concur; Judge Smith taking no part.
 

 Order modified, etc.