[889 NYS2d 905]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v NIVEN DERRELL, Defendant.

Supreme Court, New York County, December 3, 2009

APPEARANCES OF COUNSEL

*Jonathan Fink,* New York City, for defendant. *Robert M. Morgenthau, District Attorney (Edgar Fankbonner* of counsel), for plaintiff.

## OPINION OF THE COURT

DANIEL P. CONVISER, J.

The defendant is charged with criminal possession of a weapon in the third degree (a gravity knife) and criminal possession of a controlled substance in the fifth degree (cocaine). A hearing was held before this court to determine whether probable cause existed to arrest the defendant and whether a gravity knife recovered from defendant's car and cocaine recovered during defendant's arrest are admissible against him at trial. The prosecution called three witnesses—Police Officer Edgardo Cortes, Police Officer Franklin Salinas, and Police Officer Franz Zabala. I find their testimony to be credible. The defendant called no witnesses. For the reasons stated below, defendant's motion to suppress the narcotics recovered at the time of his arrest is denied and defendant's motion to suppress the alleged gravity knife recovered in his car is granted.

## Statement of Facts

Police Officer Edgardo Cortes, a four-year employee of the NYPD currently assigned to the Manhattan North Task Force, testified that of the approximately 50 arrests he has participated in, approximately 40 stemmed from automobile stops. He stated

that at approximately 2:00 A.M. on June 1, 2008 he was the driver in a marked police van while on uniformed duty with his partner, Police Officer Franklin Salinas, assigned to address traffic conditions in the 32nd Precinct in New York County. While traveling northbound on 7th Avenue in the vicinity of 151st Street, Officer Cortes stated that he observed a four-door sedan traveling southbound. He testified that based on his training and experience, he was able to observe that the car had illegally tinted windows and that he was not able to see inside the vehicle by looking through the windows. The area was lit by streetlights and it was a clear evening.

Officer Cortes stated that he made a U-turn and activated the van's sirens and lights. Upon doing so the vehicle with the unlawful tint pulled over. The driver of the vehicle was identified by Officer Cortes as the defendant. Officer Cortes stated that there was a black woman in her mid-20s seated in the passenger seat of the stopped vehicle. Officer Cortes and his partner approached the opposite sides of the front seat of the car, but he could not recall which of the two positions he and his partner were in. Officer Cortes was also unable to recall whether it was he or his partner who conducted a computer check of the defendant's license, but he did recall learning that the defendant's driving privileges had been suspended. Officer Cortes stated that he used an instrument called a tintometer to verify that the tint on the windows of the vehicle the defendant was driving was unlawful. Officer Cortes stated that the minimum level of light transparency required by law is 70% and that the level of light transparency of the tint on the windows of the defendant's car was only 32%.

Because both he and his partner had other obligations later that day and the time it would have taken to complete the processing of the defendant's arrest conflicted with those obligations, another officer, Police Officer Zabala, was contacted to effect the arrest of the defendant. Officer Zabala and his partner, Officer Rodriguez, then arrived at the scene in a marked patrol car.

No summons was issued to the defendant for the tinted window violation. Officer Cortes testified that the decision about whether or not to issue such a summons was a discretionary one to be made by the arresting officer, Officer Zabala. Officer Cortes said that he informed Officer Zabala regarding the illegal tint. The female passenger was released and subsequent to learning that the defendant's driving privileges had been

suspended the defendant was handcuffed by Officer Zabala and escorted by Officers Zabala and Rodriguez to their patrol car which was parked approximately 50 feet from the defendant's vehicle. Officer Zabala was holding the defendant's right arm and Officer Rodriguez was holding his other arm when they reached the police vehicle. As the defendant was being placed in Officers Zabala and Rodriguez's vehicle he was observed reaching towards his pocket or waist by Officer Cortes. From less than a foot away Officer Cortes stated that he then observed an item fall to the ground next to the defendant, but that he never saw the defendant throw or drop anything. Officer Cortes did not recall what the item looked like but he did see Officer Zabala pick it up from the ground.

Officer Salinas, a four-year employee of the NYPD, testified that he is assigned to the Manhattan North Task Force and that approximately half of the 100 arrests he has participated in while employed in that capacity have stemmed from car stops. He stated that he was on duty with his partner Officer Cortes at approximately 2:00 A.M. on June 1, 2008 when he observed a Nissan traveling southbound in the vicinity of 151st Street and 7th Avenue that appeared to have illegally tinted windows.

After stopping the vehicle Officer Salinas approached it from the passenger side and Officer Cortes approached the driver's side. The officers did not have their guns drawn. The driver of the vehicle was asked to roll both windows down to allow the officers to look clearly into the vehicle. Officer Salinas stated that he was using a flashlight but could not recall whether his partner was using a flashlight. He identified the defendant as the person who had been driving the Nissan.

Officer Cortes asked the defendant for his driver's license and then both Officer Cortes and Officer Salinas returned to their vehicle. After returning to the police vehicle Officer Salinas stated that he observed the defendant making furtive gestures. Officer Salinas had difficulty observing the defendant since the rear window of the defendant's vehicle through which he was looking was also tinted. After learning that the defendant's license was suspended by running it through the computer he (Officer Salinas) called Officer Zabala.

When Officer Zabala arrived with his partner he placed the defendant in handcuffs. Officer Salinas asked the front passenger to exit the vehicle and then proceeded to search the interior of the vehicle. With respect to Officer Salinas' rationale for searching the vehicle, the following colloquy ensued on direct examination by the People:

"Q: For what purpose [did you search the vehicle]?

"A: Search incident to lawful arrest. I also saw the defendant making furtive movements inside his vehicle during the car stop.

"Q: You stated it was a search incident to—That's a legal conclusion. Is it fair to say that you searched the vehicle because the driver had been arrested?

"A: Yes.

"Q: What is the reason that you searched the vehicle after the defendant's arrest?

"A: To make sure that there wasn't anything in the car, anything that could harm us.

"Q: What parts of the car did you in fact search?

"A: All the reachable, lungible areas.

"Q: When you say the reachable areas, reachable in relation to what?

"A: To where the motorist was seated. Where the defendant was seated." (Nov. 2, 2009 hearing tr at 46.)

Officer Salinas also testified, with respect to the furtive movements he described: "I saw him moving a lot inside the vehicle. I couldn't really see because I believe his rear was tinted also." (*Id.* at 54, lines 4-6.) Officer Salinas stated that he searched the front and rear seats, the middle console and the doors. From the center console area Officer Salinas recovered a knife. In order to retrieve the knife Officer Salinas stated that he had to lift a tab on a console, which he described as an armrest, and then reach inside the compartment. The knife was resting atop other unspecified items in the console which were not seized. Officer Salinas at first stated that while he was conducting the search Officer Zabala was in the rear of the vehicle, but subsequently stated that he didn't recall whether Officer Zabala was inside the defendant's vehicle at the same time that he was conducting the search. Officer Salinas was unable to recall where Officer Rodriguez was at the time of the search, but stated that the defendant was with Officer Cortes at the rear of the vehicle.

Subsequent to retrieving the knife from the console of the defendant's vehicle Officer Salinas "flipped it out" and observed the blade lock in place. Officer Salinas placed the knife in his pocket and exited the vehicle. Officer Salinas stated that he then informed Officer Zabala that he had found the knife and surrendered custody of the knife to Officer Zabala. At the time he did this the defendant was already handcuffed.

When asked about the notations that he made in his memo book related to this incident, the officer stated the following:

> "It says one under. P.O. Cortes noticed person fidgeting at the scene in back of his car. Later—I can't make that out. Later moved to back of RMP [referring to police vehicle]. Cortes saw person toss bag of alleged drugs under RMP.
>
> "After person was in [sic] of RMP I checked the car and recovered gravity knife from the center console of the vehicle." (Id. at 67, lines 18-24.)

On re-cross-examination Officer Salinas stated that he searched the defendant's vehicle twice. He conducted the first search alone and recovered the gravity knife. He conducted a second search with Officer Zabala during which no additional contraband was recovered.

Officer Salinas' testimony indicated that at the time he began his initial search of the defendant's car (the search which resulted in the gravity knife being recovered), the defendant was handcuffed at the back of the defendant's car with Officer Zabala and Officer Cortes. As the search progressed, the defendant was walked to the patrol car. He was then placed in the patrol car. At the time of this initial search, the female passenger was standing on the sidewalk located next to the car's passenger side about 10 feet away from the car and was not in handcuffs. The car doors were unlocked and the windows were down.

Police Officer Franz Zabala, a four-year employee of the NYPD assigned to the Manhattan North Task Force, testified that most of the approximately 50 arrests he has participated in stemmed from stops of automobiles. He stated that he was on duty on June 1, 2008 at approximately 2:00 A.M. with his partner Officer Rodriguez on regular uniformed patrol in a marked police vehicle when he received a call from Officers Salinas and Cortes asking him to respond to the vicinity of 151st Street and 7th Avenue. He was informed that the officers had stopped an individual with a suspended license. Officer Zabala was asked and agreed to be the arresting officer because Officers Cortes and Salinas were unavailable.

When he arrived at the scene Officer Zabala asked the defendant to exit his vehicle and the defendant did so. Officer Zabala stated that there was also a female passenger in the vehicle. Officer Zabala said that he verified that the defendant's license was suspended, handcuffed the defendant and then he

and his partner placed the defendant in the rear of their police cruiser. At the time the defendant was handcuffed Officer Zabala stated that neither he nor any of the other three officers present had his weapon drawn, nor did he make any promises or threats to the defendant.

As the defendant was being placed in the rear of the police cruiser Officer Zabala testified that Officer Cortes pointed to the ground and stated that he observed the defendant drop something. Officer Zabala asked the defendant if the items belonged to him. The defendant stated in reference to items on the ground: "Those are not mine." Officer Zabala said that he recovered the items which were less than a foot away from where the defendant was standing by his feet and which consisted of 11 small clear plastic bags of crack cocaine which he knew to be crack cocaine based on his training and experience in identifying narcotics.

On cross-examination Officer Zabala acknowledged having read and signed the felony complaint in the instant matter. He further acknowledged that the felony complaint stated that the glassines of crack cocaine were recovered from the defendant's pocket. Officer Zabala explained that though the contraband was recovered from the ground it must have initially been in the defendant's pocket because he was the only individual who could have possessed it. Although Officer Zabala did not observe the defendant throw anything to the ground he did say that he saw him "moving around with his hands . . . [r]eaching into his pocket."

With respect to his testimony before the grand jury Officer Zabala testified that he recalled being asked whether he recovered anything from the defendant and stating that he recovered 11 bags of cocaine and a gravity knife. On redirect examination Officer Zabala explained that he was positive that the glassines of crack cocaine which were recovered from the ground came from the defendant. At no time did he expressly state to the grand jury that he recovered drugs or a knife from the defendant's pockets or person. When defense counsel on re-cross-examination showed Officer Zabala a data sheet prepared by the District Attorney's office and asked if it refreshed his recollection as to whether he had told an assistant district attorney that the crack cocaine was recovered from the defendant's pocket he stated that it did not. Officer Zabala said that he vouchered the knife recovered by Officer Salinas. The defendant was arrested rather than issued a summons, Officer Za-

bala explained, because he could not legally drive with a suspended license. The vehicle could not be released to the female passenger because neither she nor the defendant was the registered owner of the vehicle. Officer Zabala testified that while transporting the defendant back to his command, the defendant stated: "I got more."

There was no testimony at the hearing that the cocaine which the police found at defendant's feet was detected prior to the search of the car by Officer Salinas. There is no indication in the transcript that Officer Salinas was aware of the cocaine at the time he performed the search of the car or that the presence of the cocaine formed any part of Officer Salinas' motivation for conducting the vehicle search. The timeline of the testimony of the three witnesses indicates that at the time the narcotics were detected, Officer Salinas had already begun to search the vehicle. Officer Salinas testified that the defendant was at the back of the defendant's car when the search began and was then walked over to the police vehicle as Officer Salinas conducted the initial search of defendant's car which resulted in the recovery of the gravity knife. Officer Zabala testified that the cocaine was first detected when the defendant was being placed into the police vehicle.

## Conclusions of Law

### Probable Cause for Arrest

The police are authorized to stop a motor vehicle without a warrant if there exists probable cause to believe a traffic infraction has been committed, irrespective of whether the primary motivation of the police is to conduct a separate investigation. (*People v Robinson*, 97 NY2d 341 [2001]; *People v Webb*, 291 AD2d 319 [1st Dept 2002].) Operating a motor vehicle with excessively tinted windows is a violation of the Vehicle and Traffic Law which justifies the stop of the automobile by the police. (*People v Cuevas*, 203 AD2d 88 [1st Dept 1994], *lv denied* 83 NY2d 909 [1994].)

Here, the evidence established that the defendant was observed operating a motor vehicle which the police reasonably believed to have excessively tinted windows, an initial observation which was subsequently confirmed when a tintometer test was conducted. Accordingly, the police were justified in stopping the vehicle. Upon determining that a traffic infraction has been committed the police may request to see a driver's license and request pedigree information in order to determine the defend-

ant's status, as the police did here. (*People v Thomas*, 19 AD3d 32 [1st Dept 2005], *lv denied* 5 NY3d 795 [2005].) Upon then determining that the defendant's license was suspended, the police were entitled to arrest him for that crime.

The defendant argues that the police acted unlawfully in initially arresting him for driving with a suspended license because they could have issued him a summons instead. (*See People v Howell*, 49 NY2d 778 [1980] [arresting a defendant rather than issuing a summons for reckless driving is not a preferable procedure and may result in a subsequent full search of the defendant being invalid].) Appellate authority subsequent to *Howell*, however, has repeatedly upheld the arrest and search of defendants where the police have probable cause to believe that a driver has a suspended license, regardless of whether or not that criminal offense was coupled with an additional traffic infraction, as occurred here. (*See People v Davis*, 32 AD3d 445 [2d Dept 2006], *lv denied* 7 NY3d 924 [2006] [search after arrest for suspended license with traffic infraction proper]; *People v Hill*, 30 AD3d 687 [3d Dept 2006] [absence of copy of physical license and suspension of driving privileges justified arrest and search]; *People v Chatelain*, 65 AD3d 930 [1st Dept 2009] [upholding arrest for suspended license]; *People v Diggs*, 38 AD3d 565 [2d Dept 2007], *lv denied* 9 NY3d 922 [2007] [upholding arrest for suspended registration]; *People v Mitchell*, 303 AD2d 422 [2d Dept 2003], *lv denied* 100 NY2d 564 [2003] [upholding arrest for suspended license]; *People v Buckmon*, 293 AD2d 623 [2d Dept 2002], *lv denied* 98 NY2d 729 [2002] [upholding arrest for revoked learner's permit].) The facts here fall squarely within the parameters of this appellate authority. For all of these reasons, the court finds that the police had probable cause to initially arrest the defendant for driving with a suspended license.

Motion to Suppress Cocaine

At a hearing to suppress physical evidence pursuant to CPL 710.60 (1) the defendant bears the initial burden to show he has standing to challenge a search or seizure by law enforcement. (*People v Wesley*, 73 NY2d 351 [1989], *on remittitur* 154 AD2d 880 [4th Dept 1989], *lv denied* 75 NY2d 777 [1989]; *People v Ladson*, 298 AD2d 314 [1st Dept 2002], *lv denied* 99 NY2d 616 [2003].) Standing requires a "legitimate expectation of privacy in the place or item that was searched." (*People v Ramirez-Portoreal*, 88 NY2d 99, 109 [1996].) The analysis requires a determination of whether a defendant exhibited a subjective

expectation of privacy in the place or item searched and also a determination of whether that expectation was reasonable under the circumstances. (*Id.*)

Here, the cocaine defendant argues should be suppressed was found on the ground next to him. There was no direct evidence at the hearing that the defendant discarded the narcotics, although a reasonable inference could be drawn that the narcotics fell from his pocket when he was in the process of being arrested, either by accident or through defendant's deliberate actions. Upon being confronted with the discovery of the narcotics, defendant unequivocally denied any possessory interest in them.

■ Courts in similar circumstances have determined that defendants have lacked standing to challenge contraband they may have discarded. In *People v Sosa* (246 AD2d 387 [1st Dept 1998], *lv denied* 91 NY2d 945 [1998]), for example, the Court held that defendant's actions in throwing a bag two to three feet in front of him onto a busy sidewalk and then walking 10 to 15 feet away demonstrated that he had neither a subjective nor objective expectation of privacy in the item. Here, the fact that the narcotics were found on the ground and defendant denied ownership of them demonstrates that he had no subjective expectation of privacy in the narcotics and no standing to challenge their seizure.

Even if the court were to find that the defendant had standing to move to suppress the cocaine, the defendant's statement denying any possessory interest in the narcotics established that if he did initially possess them, he intended to abandon those items in an attempt to avoid arrest. His actions and statements, moreover, were not the product of any unlawful police conduct or coercion. Assuming defendant had standing to move to suppress the cocaine, his motion must additionally be denied because he abandoned the narcotics. (*People v Anderson*, 268 AD2d 228 [1st Dept 2000], *lv denied* 95 NY2d 792 [2000]; *People v Gabriel*, 264 AD2d 641 [1st Dept 1999], *lv denied* 94 NY2d 823 [1999]; *People v Hanson*, 195 AD2d 408 [1st Dept 1993].) Finally, even if the defendant had standing to challenge the seizure and did not abandon the narcotics the police had validly placed the defendant under arrest when the narcotics were discovered and observed the narcotics in plain view from a lawful vantage point when they were seized. Defendant's motion to suppress the narcotics recovered during his arrest is thus additionally denied on that ground.

Vehicle Search Incident to Arrest

In *Arizona v Gant* (556 US —, 129 S Ct 1710 [2009]), the United States Supreme Court revised the predominant understanding of the permissible parameters of the "search incident to lawful arrest" doctrine in automobile search cases under the Fourth Amendment. As in the instant case, the defendant in *Gant* was arrested for driving with a suspended license. He was placed in handcuffs and locked in the back seat of a police vehicle. Officers then searched his car. They recovered a gun and a bag of cocaine. Defendant was charged with two drug offenses and moved to suppress the evidence recovered from his car. He argued that suppression was proper because he posed no threat to the officers while handcuffed and because he was arrested for a traffic offense for which no evidence would likely be found in his vehicle. The officer who conducted the search testified at the suppression hearing that the search was proper because "the law says we can do it." (556 US at —, 129 S Ct at 1715.)

The Court analyzed its prior precedents in *Chimel v California* (395 US 752 [1969]) and *New York v Belton* (453 US 454 [1981]) as applied to the search of automobiles incident to arrest. The Court noted that in *Chimel*, it had held that a search incident to a lawful arrest could include only the person of the arrestee and the area within his immediate control, "the area from within which he might gain possession of a weapon or destructible evidence" (556 US at —, 129 S Ct at 1716, quoting *Chimel* at 763.) This limitation, the Court noted in *Gant*, served the dual purpose of ensuring the safety of an arresting officer and eliminating the possibility that an arrestee might seek to conceal or destroy evidence. If those concerns were absent, under *Chimel*, a search could not be justified as being conducted because it was incident to a lawful arrest. The Court applied the *Chimel* rule in the context of automobile searches in *Belton*. There, the Court held that when an officer arrests the occupant of a car, " 'he may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile' and any containers therein" (*Gant,* 556 US at —, 129 SCt at 1717, quoting *Belton* at 460). The *Belton* Court's decision was premised on the assumption that an arrestee would normally have access to items within the passenger compartment of a car. (*Id.*)

The *Gant* Court went on to note that "our opinion [in *Belton*] has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the

search." (*Gant*, 556 US at —, 129 S Ct at 1718.) Despite this predominant understanding of the holding in *Belton*, however, the *Gant* Court rejected a search incident to arrest rule which would authorize such searches whenever a suspect was arrested, regardless of whether the suspect, in fact, was able to reach into the passenger compartment of a car. The Court explained that such a rule would not comport with the rationales for such searches articulated by the Court in *Chimel*. The Court thus held that "the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." (*Gant*, 556 US at —, 129 S Ct at 1719.)

The Court also articulated a second rule. It held that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " (556 US at —, 129 S Ct at 1719, quoting *Thornton v United States*, 541 US 615, 632 [2004, Scalia, J., concurring in judgment].) Since the defendant in *Gant* was handcuffed and away from the car at the time of the search, there was no possibility that he could reach into the car and obtain a weapon or destroy evidence. Since the arrest (as in the initial basis for arrest in the instant case) involved driving with a suspended license, and, moreover, there was no likelihood of discovering evidence related to his arrest in the car, the Court held the evidence recovered in the car search had to be suppressed.

Critically, with respect to the instant motion, the *Gant* Court held that the question of whether a search incident to arrest was lawful depended upon the defendant's reach at the time of a search, rather than the time of an arrest: "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search." (*Gant*, 556 US at —, 129 SCt at 1723; *see also* dissenting op of Alito, J., 556 US at —, 129 S Ct at 1729-1731 [discussing the practical problems arising from that doctrine].)[1]

Under New York law, an exception to the warrant requirement and the requirement for probable cause to search a car

---

1. Justice Alito, in his dissenting opinion in *Gant*, joined by Chief Justice Roberts and Justice Kennedy, argued that measuring the validity of a search incident to arrest at the time of a search rather than at the time of an arrest was contrary to prior precedent, illogical and dangerous. He noted that offi-

has existed "only to protect against the danger that an arrestee may gain access to a weapon or may be able to destroy or conceal critical evidence." (*People v Blasich*, 73 NY2d 673, 678 [1989].) Thus, "the scope of such a search must be limited to the arrestee's person and the area from within which he might gain possession of a weapon or destructible evidence." (*Id.*) This formulation has been understood to be more restrictive upon police conduct than the predominant understanding of the federal constitutional rule which existed prior to *Gant*. New York case law has indicated, however, that a suspect's grabbable area is measured from the moment of an arrest, rather than the moment a search has been conducted, assuming the two events are sufficiently contemporaneous. In *People v Smith* (59 NY2d 454 [1983]), for example, a defendant was arrested under circumstances where the police had reason to believe he might be armed. He was handcuffed and his briefcase was taken away from him. The police opened the briefcase and found a handgun. In refusing to suppress the gun, the Court of Appeals held that

> "[w]hether the circumstances are such as to justify a warrantless search incident to arrest is to be determined, as we recognized in our first *Belton* decision, at the time of the arrest, but the justification does not necessarily dissipate with the making of the arrest. For compelling reasons, such as the safety of the officers or the public or to protect the person arrested from embarrassment, a search 'not significantly divorced in time or place from the arrest' may be conducted even though the arrested person has been subdued and his closed container is within the exclusive control of the police . . .
>
> "Whether in fact defendant could have had access to the briefcase at the moment it was being searched is irrelevant. He clearly could have had when arrested and neither the distance from nor the time

---

cers arresting a suspect will almost always remove that suspect from a car before conducting a search, meaning that the first prong of the *Gant* rule which allows the police to search a suspect's grabbable area in an automobile incident to an arrest will "rarely come into play" (556 US at —, 129 S Ct at 1730). Justice Alito also argued that the decision creates the "perverse incentive" for the police to prolong the period of time in which a suspect can remain unsecured in a car in reach of possible weapons, in order to justify a protective search of the car. (*Gant*, 556 US at —, 129 S Ct at 1730.) Justice Breyer also joined Justice Alito, Chief Justice Roberts and Justice Kennedy in dissent except with respect to the portion of the dissenting opinion which outlined the policy arguments recounted here.

elapsed since the arrest was sufficient to dissipate the reasonableness of conducting a search of the briefcase without a warrant." (*Id.* at 458-459 [citations omitted].)

Thus, under the law in effect in New York prior to *Gant*, in contrast to the *Gant* decision, the question was not whether, at the time a search was conducted, a defendant, in reality, could jeopardize the safety of an officer or the preservation of evidence. The inquiry considered whether such circumstances existed before the search was made, so long as the relevant criteria existed at the time of the arrest and the arrest and search were sufficiently close in space and time. In this respect the Federal Constitution now arguably imposes more restrictions on an officer's exercise of the right to search incident to an arrest (at least in the vehicle context) than the State Constitution imposed prior to *Gant*.

■ The parameters of New York's search incident to arrest rule have been the subject of numerous decisions, some of which are arguably not easily reconcilable. (*See e.g. People v Gokey*, 60 NY2d 309 [1983]; *People v Torres*, 74 NY2d 224 [1989]; *People v Wylie*, 244 AD2d 247 [1st Dept 1997], *lv denied* 91 NY2d 946 [1998]; *People v Faines*, 297 AD2d 590 [1st Dept 2002], *lv denied* 99 NY2d 558 [2002].) Regardless of whether the recovery of the gravity knife here would have been permissible under the State Constitution as a valid search incident to arrest prior to *Gant*, however, it is no longer permissible pursuant to that doctrine under the Federal Constitution.[2]

At the time the search of defendant's car began, the defendant was standing behind his car, in handcuffs, in police custody. As the search continued, he was walked back to the police car. At no time was he in any position to obtain or disturb any objects in the passenger compartment of his car. As in *Gant*, moreover, there was no reason to believe in this case that evidence of the crime the defendant was initially arrested for— driving with a suspended license—might have been uncovered during the search. In fact, as noted supra, both *Gant* and the instant case involved arrests for driving with a suspended

---

2. Although the Supreme Court in *Gant* arguably announced a new rule in search incident to arrest cases, and although the events which gave rise to defendant's arrest predated the Supreme Court's decision in *Gant*, it is clear that the *Gant* rule, which predated the hearing in this case, applies to the court's decision here. (*See Teague v Lane*, 489 US 288 [1989].)

license. (*See United States v Majette*, 326 Fed Appx 211 [4th Cir 2009] [in light of *Gant*, police not entitled to search car stopped for tinted window violation where defendant is arrested for driving with suspended license].)

The defendant here was also arrested for the possession of cocaine. It could be argued that the recovery of that cocaine would provide a justification to search the defendant's car because the defendant's act of discarding or inadvertently dropping cocaine (a reasonable inference of what occurred here) would support a reasonable belief that an additional quantity of narcotics might be recovered from his car. Thus, it could be argued, the second prong of the *Gant* rule, a " 'reason[ ] to believe evidence relevant to the crime of arrest might be found in the vehicle,' " justified the search (556 US at —, 129 S Ct at 1719). The evidence is clear, however, that the police were not aware that the defendant possessed or discarded cocaine at the time they searched the car and recovered the gravity knife. It is also clear that they did not undertake the search because of any belief that they might find narcotics in the vehicle. The fact that cocaine was discovered *after* the search which recovered the knife in this case commenced obviously cannot provide a retroactive justification for that search.

In fact, it is clear from the colloquy recounted supra, regarding the purported justification for searching the car, that the police searched the car primarily because they believed the arrest of the defendant on charges of driving with a suspended license gave them the right to do so. In that sense, as in other respects, the instant case is strikingly similar to *Gant*. (Compare police officer's justification for search in *Gant* "the law says we can do it" [556 US at —, 129 S Ct at 1715] with the justification by the police here "[s]earch incident to lawful arrest" [Nov. 2, 2009 hearing tr at 46].)

Another possible justification for the search here was that the furtive movements observed by the police along with the fact that their view of those movements was obscured because of the tinted windows in defendant's car justified a protective search of the car for weapons. (*See People v Edwards*, 222 AD2d 603 [2d Dept 1995], *lv denied* 88 NY2d 984 [1996]; *People v Hutchinson*, 22 AD3d 681 [2d Dept 2005]; *People v Anderson*, 17 AD3d 166 [1st Dept 2005].) Officer Salinas testified that he observed the defendant making "furtive movements" in the car and said his view of those movements was obscured by the car's tinted windows. The only specific description of these "furtive move-

ments" which was offered, however, was that the defendant was "moving a lot" inside the vehicle.

Even assuming, however, that this observation would have justified a protective search for weapons prior to *Gant,* such a rationale, in the court's view, is no longer sufficient under the facts of this case to justify such a search under the Federal Constitution where a defendant is in no position to obtain a weapon when a search is conducted. As noted supra, the *Gant* rule measures the threat to an officer's safety from the instant of a search rather than the time of arrest. As noted supra, the defendant here was handcuffed, under arrest in the custody of two police officers with two additional officers in close proximity and standing at the back of his car when the search began. To have posed a threat to the police with the gravity knife which was recovered in this case, he would have had to walk over to the front doors of the car, open them, open the console where the gravity knife was recovered (which required that a tab be pressed), reach into the console, take out the knife, open the knife and then harm the four police officers who were at the scene, all while wearing handcuffs and in police custody. (*See Gant,* 556 US at —, 129 S Ct at 1714 [suppression proper because defendant "could not have accessed his car to retrieve weapons or evidence at the time of the search"].)

In the court's view, the search may also not be justified by the "automobile exception" to warrant requirement under state law. Under that doctrine, where an arrest is made and there is "reason to believe that the vehicle or its visible contents may be related to the crime for which the arrest is being made . . . or there is reason to believe that a weapon may be discovered or access to means of escape thwarted" a car may be searched incident to lawful arrest even where no other exigencies exist. (*People v Belton,* 55 NY2d 49, 55 [1982].) This allowance for a search overlaps to some extent with the second rationale for a search incident to arrest announced by the Court in *Gant,* that is, where there is reason to believe that evidence relevant to the crime of arrest might be found in the vehicle. Here, at the time of the search, defendant had been arrested only for driving with a suspended license and there was no reason to believe that any evidence related to that crime would be found by searching the vehicle. The fact that he was moving a lot inside the vehicle after it was stopped, in the court's view, also did not provide a basis to believe there was a weapon in the car.

Another possible justification for the search would be to prevent the passenger in the defendant's car, who was not ar-

rested, from gaining access to a weapon or evidence. In *Michigan v Long* (463 US 1032 [1983]) the Court held that it would be proper for the police to search the passenger compartment of a vehicle where there was reasonable suspicion that a person, regardless of whether or not they were the arrestee, was dangerous and might gain the immediate control of weapons. There was no evidence proffered here, however, that defendant's passenger met any of these criteria. Indeed she was at no time handcuffed, arrested or otherwise secured by the police during the encounter and there was no evidence presented at the hearing to suggest that the police viewed her as particularly threatening.

In *United States v Morillo* (2009 WL 3254431, 2009 US Dist LEXIS 94396 [ED NY, Oct. 9, 2009]), the court found a search which was otherwise barred by the *Gant* rule was validly conducted for two reasons. In *Morillo*, the police stopped the defendant for riding his bicycle on the sidewalk, the defendant fled, resisted arrest and was then arrested with a backpack. The police searched the backpack and recovered a loaded handgun. The court held first that "special exigencies" justified the backpack search (2009 WL 3254431, *7, 2009 US Dist LEXIS 94396, *2). The defendant's extremely evasive and confrontational behavior in response to being accused of a minor offense (riding a bicycle on the sidewalk) gave the police reason to believe there was something potentially dangerous in defendant's backpack. The police testified that they needed to know what was in the backpack before they transported a potentially dangerous object in their patrol car. The instant case, however, is distinguishable from *Morillo* with respect to the initial basis on which the court held the search in that case valid in two respects.

First, the fact that the defendant was "moving a lot" in his car and had a suspended license did not create the same potential danger that the defendant in *Morillo* was reasonably thought to have posed by virtue of the conduct he engaged in. Second, more significantly, the motivation of the police in searching the car in this case was not to ensure that it was safe for transport. The search was conducted here both because the police believed defendant's arrest entitled them to conduct the search and in order to uncover any possible weapons which the defendant might have had access to at the moment he was arrested. These were the same rationales which the Court in *Gant* rejected.

The People argue that even if this court finds that the police were not authorized to search defendant's car to recover the gravity knife, the inevitable discovery doctrine should serve to allow the knife's admission. Under this doctrine,

> "evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence." (*People v Fitzpatrick*, 32 NY2d 499, 506 [1973], *cert denied* 414 US 1033 [1973].)

The People posit that even if the police did not originally search the car, the gravity knife would have been discovered in a subsequent inventory search. This was the second basis on which the search in *Morillo* was found to be valid under federal law. It has also been the basis under which a search has been found to be justified notwithstanding a violation of the *Gant* rule in some other federal cases. (*See e.g. United States v Ruckes*, 586 F3d 713 [9th Cir 2009].) In addition, an argument could be advanced that under *Gant*, once the narcotics were found on the ground next to the defendant, the police would have been permitted to search the car for additional evidence of illegal narcotics. Thus, the inevitable discovery rule might also arguably apply for this second independent reason.

The inevitable discovery rule may not be invoked to validate the search here, however, in the court's view, for two reasons. First, the doctrine cannot be applied because of its limitations under state law. In *People v Stith* (69 NY2d 313 [1987]), the Court of Appeals held that the doctrine's applicability depended on whether it was sought to be applied to "primary" or "secondary" evidence. The Court described primary evidence as evidence "illegally obtained during or as the immediate consequence of the challenged police conduct." (*Id.* at 318.) In contrast, secondary evidence "was evidence obtained indirectly as a result of leads or information gained from that primary evidence." (*Id.*) The Court held that primary evidence "i.e. the 'very evidence . . . obtained during or as the immediate consequence' of the illegal conduct, would still be subject to exclusion even if it would most likely have been discovered in the course of routine police procedures." (*People v Turriago*, 90 NY2d 77, 86 [1997], quoting *Stith* at 318.) In contrast, secondary evidence, that is, "evidence[ ] obtained as a result of information gleaned from or by other exploitation of[ ] the tainted primary

evidence" could be admitted if it satisfied the requirements of the inevitable discovery doctrine. (*Turriago* at 86, citing *Stith* at 319; *see also People v Binns*, 299 AD2d 651 [3d Dept 2002], *lv denied* 99 NY2d 612 [2003].)

In this case, it is clear that the gravity knife discovered during the illegal search of defendant's car was primary evidence, that is, the very evidence which was obtained through the illegal search. For this reason, the inevitable discovery doctrine cannot be used as a basis to admit the knife. In addition, in the court's view, inevitable discovery may not be applied here because there was no testimony at the hearing that the car would have been subject to either a search for narcotics or an inventory search, in the event the car had not been initially searched incident to defendant's arrest. In comparison, in *Morillo*, for example, the government presented detailed evidence regarding inventory searches. Application of the inevitable discovery rule under New York law requires "a very high degree of probability that the evidence sought to be suppressed would inevitably have been discovered irrespective of the initial wrong." (*Stith* at 318 [citations and internal quotation marks omitted].) This court could obviously fill in the record in this case and simply presume that the police would have conducted an inventory search or a search for narcotics if they had not searched the car incident to the defendant's arrest. Given the fact that the People presented three witnesses in this case, however, and none testified, even in conclusory form, that any such search would have been conducted, the court does not believe that this "very high degree of probability" standard has been met.

## Defendant's Statements

As noted supra, the police witnesses at the hearing testified about two statements the defendant allegedly made. He is alleged to have initially stated: "[t]hose are not mine" in reference to the cocaine found at his feet and is also alleged to have stated in the patrol car while being transported to the station house: "I got more." At the hearing, the People said that they would not seek to introduce either statement during their case-in-chief and indicated that there was no need to litigate the admissibility of this evidence with respect to their direct case, notwithstanding the fact that a *Huntley* hearing had been ordered. Because the People conceded that this evidence would not be admitted at trial, the People are precluded from introducing evidence of either statement in their case-in-chief.

There was no evidence at the hearing, however, that either statement was obtained by coercion or was involuntary in the traditional sense. The officer who allegedly heard both statements, Officer Zabala, testified at the hearing about the statements and the circumstances under which they were made and was cross-examined by defendant's counsel. For this reason, in the event defendant testifies at trial, the court holds that his two statements were not made involuntarily in the traditional sense and may be used to impeach the defendant's testimony, if the use of those statements for impeachment purposes would otherwise be proper. (*See People v Walker*, 110 AD2d 730 [2d Dept 1985], *affd* 67 NY2d 776 [1986].)

For all of these reasons, defendant's motion to suppress the cocaine recovered during his arrest is denied, defendant's motion to suppress the gravity knife recovered from his car is granted, the People are precluded from introducing evidence of the two statements allegedly made by the defendant during their direct case and are not barred from using those statements to impeach the defendant in the event he testifies at trial if the use of those statements for impeachment would otherwise be proper.