People v Morales (2015 NY Slip Op 01190)





People v Morales


2015 NY Slip Op 01190


Decided on February 10, 2015


Appellate Division, First Department


Richter, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 10, 2015
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Rolando T. Acosta
Karla Moskowitz
Rosalyn H. Richter
Darcel D. Clark, JJ.


918/09 13693 

[*1]The People of the State of New York Respondent,
v
Miguel Morales, Defendant-Appellant.



Defendant appeals from the judgment of the Supreme Court,
New York County (Robert M. Stolz, J. at hearing;
Bruce Allen, J. at jury trial and sentencing),



rendered September 15, 2010, convicting him of
criminal possession of a controlled substance
in the fifth degree, and imposing sentence.
Steven Banks, The Legal Aid Society, New York
(Svetlana M. Kornfeind of counsel), and
Kirkland & Ellis LLP, New York (Geoffrey A.
David of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New
York (Ryan Gee and Martin J. Foncello of
counsel), for respondent.



RICHTER, J.


In this appeal, we are asked to determine whether the police lawfully searched defendant's jacket, which was lying on the trunk of a police car, while defendant was sitting handcuffed in the vehicle and numerous police officers were present at the scene. We conclude that, at the time of the search, the jacket was not within defendant's grabbable area, and there were no exigent circumstances justifying a warrantless search of the jacket incident to arrest (see People v Jimenez, 22 NY3d 717 [2014]; People v Gokey, 60 NY2d 309 [1983]). The dissent's contention that our decision will endanger the police and public is unsupported by the record, and cannot be reconciled with controlling precedent. We recognize the difficult job that police officers face when arresting suspects, but no one was in danger here once the suspect was subdued, and the officers had other legal means available to them to secure the jacket safely. Under these circumstances, the evidence recovered from the jacket should have been suppressed.
The relevant facts at the suppression hearing established the following. On February 29, 2008, at around 9:00 p.m., Officer William Svenstrup and his partner responded to a 911 call reporting that a suspicious man was inside Frank's Restaurant, located at 88 Second Avenue in Manhattan. The manager greeted the officers outside the restaurant and informed them that defendant, who was in the bar area of the restaurant, appeared to be trying to steal from women's purses. The officers entered the restaurant and asked defendant to step outside with them.
As they exited the restaurant with defendant, he turned around and placed both his hands inside his jacket pockets. The officers grabbed defendant's arms and a struggle ensued as defendant ignored the officers' request to remove his hands from his pockets. By this time, five or six additional officers had arrived on the scene. The officers subdued defendant, and he was handcuffed and placed in the back of a police car. Defendant's jacket, which had fallen off during the struggle, was resting on the trunk of the police car. While defendant was sitting in the car with handcuffs on, the officers searched the jacket pockets and found seven envelopes containing drugs, and a box cutter. The police subsequently returned the jacket to defendant.[FN1]
"[A]ll warrantless searches presumptively are unreasonable per se," and, "[w]here a warrant has not been obtained, it is the People who have the burden of overcoming" this [*2]presumption of unreasonableness (People v Hodge, 44 NY2d 553, 557 [1978]). As the Court of Appeals recently reiterated in Jimenez (22 NY3d at 717), the People must satisfy two separate requirements to justify a warrantless search of a container incident to arrest. "The first imposes spatial and temporal limitations to ensure that the search is not significantly divorced in time or place from the arrest" (Jimenez, 22 NY3d at 721 [internal quotation marks omitted]; see Gokey, 60 NY2d at 312 [item searched must be within the immediate control or grabbable area of the suspect]). The second requires the People to demonstrate the presence of exigent circumstances (Jimenez, 22 NY3d at 722). The Court of Appeals has recognized two interests underlying the exigency requirement: the safety of the public and the arresting officer, and the protection of evidence from destruction or concealment (id. at 722).
Although Jimenez had not been decided at the time the motion court denied defendant's suppression motion, the principles set forth in that case are instructive [FN2]. In Jimenez, police officers responding to a reported burglary in an apartment building encountered the defendant in the building's lobby. After the building's superintendent made gestures indicating to the officers that they should stop the defendant, the officers asked the defendant why she was in the building. They arrested her for trespassing after she provided contradictory answers. During the arrest, an officer removed the defendant's purse from her shoulder. The officer perceived the purse to be heavy and opened it, revealing a gun. The Court held that the gun should have been suppressed because the People failed to establish exigent circumstances justifying a warrantless search of the purse incident to arrest. The Court noted that neither of the police officers who testified at the suppression hearing stated that he feared for his safety or for the integrity of any destructible evidence, and, while affirmative testimony is not necessary, such a belief would not have been objectively reasonable under the circumstances. Jimenez reinforces the principle that containers cannot be searched incident to arrest unless the People affirmatively demonstrate exigency.
Here, the jacket was unquestionably outside defendant's grabbable area at the time of the search, which even the dissent acknowledges. Defendant was sitting handcuffed inside a police car, the jacket was outside lying on the vehicle's trunk, and numerous officers were on the scene. Thus, the jacket had been reduced to the exclusive control of the police and there was no reasonable possibility that defendant could have reached it (see People v Thompson, 118 AD3d 922, 923 [2d Dept 2014] [search of backpack not justified where the defendant was secured and the backpack was not within his immediate control]; People v Diaz, 107 AD3d 401 [1st Dept 2013], lv dismissed 22 NY3d 996 [2013] [search of backpack unlawful because the defendant was handcuffed at the time of the search and it was no longer in his control]; People v Julio, 245 AD2d 158 [1st Dept 1997], lv denied 91 NY2d 942 [1998] [search of bag unlawful where it was in the exclusive control of the police and the defendant was unable to reach it because he was [*3]handcuffed and surrounded by police officers).[FN3]
Further, the People failed to establish the requisite exigent circumstances justifying a warrantless search of the jacket. Although defendant had previously struggled with police, five to six additional officers had arrived on the scene and defendant was subdued and placed in the police car. Thus, the scene at the time of the search was police-controlled (see Gokey, 60 NY2d at 313-314). Officer Svenstrup, one of the responding officers, did not testify that the jacket was searched out of fear for the officers' safety or for the integrity of any destructible evidence (see Jimenez, 22 NY3d at 722-723). In any event, such a conclusion would not have been objectively reasonable under the circumstances because at the time of the search, defendant could not have reached the jacket (see Arizona v Gant, 556 US at 332 [warrantless search of jacket in the defendant's car unreasonable where the defendant, at the time of the search, was handcuffed and locked in the back of a police car]; People v Boler, 106 AD3d 1119, 1123 [3d Dept 2013] [warrantless search of the defendant's purse on the hood of her car unreasonable where, at the time of the search, she was handcuffed in the back of a police car]).
The cases relied on by the People are distinguishable. In People v Mack (82 AD3d 663 [1st Dept 2011], lv denied 17 NY3d 798 [2011]), the search was upheld because a police officer saw the defendant pick up a gun and put it in his jacket pocket. Although there were conflicting versions of the facts in Mack, there is no indication that the defendant was handcuffed at the time of the search. In People v Capers (298 AD2d 184, 184 [1st Dept 2002], lv denied 99 AD3d 580 [2003]), the defendant "chose to wear [the jacket] to the police station." In People v McPherson (300 AD2d 194, 194 [1st Dept 2002], lv denied 99 AD3d 630 [2003]), the jacket had "not yet been reduced to the exclusive control of the police."
The dissent concludes that the search here was justified because the jacket may have contained a loaded gun that would endanger the police and the public. Officer Svenstrup, however, did not testify that, once defendant was subdued, he searched the jacket due to any concern that it might contain a gun or other weapon. Nor did he state that any other exigent circumstances existed. In fact, there was no testimony whatsoever as to why the search was conducted. In any event, even if there had been a legitimate concern, at some earlier time during the encounter between defendant and the police, that defendant might retrieve a weapon from the jacket, that possibility no longer existed at the time the police conducted the search.
The fact that defendant was handcuffed in the police car and multiple officers were at the scene is minimized by the dissenting Justice who would uphold the search even though defendant had been subdued and no longer had access to the jacket. This view cannot be reconciled with the Court of Appeals' requirement that there be " a reasonable belief that the suspect may gain possession of a weapon'" (Jimenez, 22 NY3d at 722, quoting Gokey, 60 NY2d at 311 [emphasis added]). Taken to its logical conclusion, the dissent is arguing that an exigency that may have [*4]existed earlier in the encounter allowed the police to search the jacket, even where the jacket was in the exclusive control of the police. That view, if accepted, would run afoul of Court of Appeals jurisprudence and would eviscerate the grabbable area doctrine.
As the dissent concedes, the existence of exigent circumstances must be measured at the time the search is conducted. This point was recently underscored in People v Jenkins (24 NY3d 62 [2014]). In addressing the exigent circumstances exception to the warrant requirement, the Court in Jenkins found a search unreasonable because at the time of the search, any urgency had abated and there was no longer any danger to the public or the police (id. at 65). Likewise here, when the police searched the jacket, no danger to the police or public existed.
We fail to grasp the logic of the dissent's position that any such danger did not disappear simply because defendant had been subdued. In fact, it did disappear — defendant was locked in the police car, and the jacket was on the trunk. Once defendant was safely separated from the jacket, the record does not show that any harm could have resulted from the possible presence of a weapon. In any event, Officer Svenstrup or any of the other half dozen police officers at the scene could have used other legal means to secure the jacket since it was in their exclusive control. Our decision does not, as the dissent charges, break any new ground, but simply adheres to well-settled principles governing the parameters of a search incident to arrest. The dissent would extend this doctrine and hold that whenever there is the possible presence of a weapon, the police can search a container to protect themselves, even if it is nowhere near the suspect's grabbable reach. Such a conclusion finds no support in this state's jurisprudence on searches incident to arrest.
The dissent raises a host of matters neither developed in the record below nor advanced by the People. Thus, despite the fact that this case does not involve any firearm, the dissent speculates about danger to the public arising from the possible accidental discharge of a loaded gun. In doing so, the dissent appears to be justifying the search based on the emergency doctrine, an entirely separate exception to the warrant requirement. That exception, however, was never argued by the People, either below or on appeal, and there is no record evidence supporting any of the post-arrest scenarios posited by the dissent. Nor was the emergency doctrine the basis of the motion court's decision, which limited itself to the search incident to arrest exception to the warrant requirement [FN4]. It bears emphasis that the only issue on appeal is whether the police conduct was lawful under that exception. On that point, the dissent agrees with the majority that when the police searched the jacket, it was not within defendant's grabbable reach. That undeniable fact ends the inquiry and requires, under clear Court of Appeals precedent, the suppression of the items found in the jacket.
Accordingly, the judgment of the Supreme Court, New York County (Robert M. Stolz, J. at hearing; Bruce Allen, J. at jury trial and sentencing), rendered September 15, 2010, convicting [*5]defendant of criminal possession of a controlled substance in the fifth degree, and sentencing him, as a second felony drug offender previously convicted of a violent felony, to a term of 2½ years, should be reversed, on the law and the facts, the motion to suppress granted, and the indictment dismissed.
All concur except Friedman, J.P. who dissents
in an Opinion:




FRIEDMAN, J.P. (dissenting)


I respectfully dissent. Defendant's suspicious conduct immediately before his arrest "gave rise to a reasonable belief that [his jacket might have] contained . . . a weapon" (People v Jimenez, 22 NY3d 717, 724 [2014]). Specifically, as the police escorted defendant out of a restaurant, he suddenly stopped, turned around and jammed his hands into his jacket pockets; he resisted the attempts of the police to remove his hands from his pockets, and it ultimately required five or six officers to subdue him. The possible presence of a dangerous instrumentality within the jacket, which would need to be secured to prevent accidental harm to the police or others regardless of defendant's inability to retrieve it, constituted the "requisite exigency" (id.) that justified the search of defendant's jacket after he was subdued. While the jacket somehow fell off defendant during his struggle with the police, and he was sitting in a police car in handcuffs at the time the police searched the jacket outside the vehicle, the police were entitled to search the jacket for a weapon for their own protection and that of the public. Even if defendant no longer had access to any weapon secreted in the jacket, such a weapon, whether a loaded gun or a cutting instrument (such as the box-cutter the police found), could cause harm accidentally if the police did not immediately secure it.
In refraining from criticism of the initial seizure of defendant triggered by his jamming his hands into his jacket pockets during a confrontation with the police (although defendant makes this issue point I of his appellate brief), the majority itself implicitly recognizes that this action by defendant gave the police reasonable cause to suspect that the pockets contained a dangerous instrumentality. Any such instrumentality, so far as the police knew at the time, might well have remained a potential source of accidental danger after defendant and the jacket became separated. Hence, the need for an immediate search of the pockets, in the interests of public safety.
Contrary to the majority's focus on whether the jacket was within defendant's "grabbable area" when it was searched (and I agree with the majority that it was not, so there is no debate on that point), nothing in Jimenez requires the police to disregard common sense and to court the needless risk of accidental harm from a loose weapon that is reasonably suspected — based on an arrested person's own conduct immediately prior to the arrest — of being present in a garment or other container that has been removed from that person's reach. Jimenez does not require the majority's result because, unlike this case — where not even the majority can deny that [*6]defendant's suddenly jamming his hands in his jacket pockets was, in context, a threatening act suggestive of a dangerous instrumentality within, which, if present, would not cease to be dangerous once defendant was subdued — the police in Jimenez had no such grounds for reasonably suspecting that the container there in question (a woman's handbag) contained a weapon. The majority's assertion that any danger from a weapon in the jacket "did disappear" (emphasis the majority's) once defendant was handcuffed ignores the danger that a loose weapon in the jacket could cause harm accidentally, whether it was a loaded gun (which could discharge upon impact) or a knife (which could fall or poke out of the pocket and cut someone). These are not imaginary dangers, and the majority offers no example of what the police could have done to eliminate such hazards without first finding and securing any weapon secreted within the jacket (as opposed to the jacket itself)[FN5]. In sum, the majority has broken new ground in defining permissible police conduct in protecting themselves and the public from reasonably suspected dangers.
At the suppression hearing, the People pointed out that the police were rightly apprehensive at defendant's jamming his hands into his pockets because of "the unknown element" of what the pockets contained, and argued that, before returning the jacket to defendant, it was important "to make sure there's no criminality, nothing that can hurt somebody, nothing of a criminal nature before it's released from police custody." The court agreed, finding that the search of the jacket was justified "under the same rationale from their point of view that seems to me justified pulling the defendant's hands out of the pockets in the first place, namely they have to protect his own safety."[FN6] In other words, just as defendant's jamming his hands in his pockets [*7]as he was being escorted out of the restaurant gave the police reason to fear for their safety before defendant was subdued, the same action gave the police reason to fear for their safety after defendant was subdued, since any weapon in the jacket would remain a source of danger until properly secured, even if defendant had no access to it [FN7]. While the police witness did not affirmatively testify to such safety concerns, Jimenez makes clear that affirmative testimony concerning an officer's subjective state of mind is not necessary where the facts to which the officer testified would have rendered such apprehension "objectively reasonable" (22 NY3d at 723).
As I pointed out with regard to Jimenez earlier in this writing, unlike this case, where defendant's threatening conduct while being escorted out of the restaurant gave the police grounds to suspect that there was a weapon in his jacket pockets, the police in the cases on which the majority relies (with the sole exception of People v Jenkins, 24 NY3d 62 [2014], which I will discuss in the following two paragraphs) had no objectively reasonable grounds for concern that the containers in question contained weapons. For example, in granting the motion to suppress evidence recovered from the defendant's purse in Jimenez, the Court of Appeals noted that "there was no indication that the demeanor or actions of either defendant or [her companion] lent them a threatening appearance in any respect," and that "the unremarkable fact that a woman's purse appeared heavy is insufficient, on its own, to support a reasonable belief that it contains . . . a weapon" (22 NY3d at 723)[FN8]. People v Gokey (60 NY2d 309 [1983]), where the search of a [*8]duffel bag was held unreasonable, is likewise distinguishable; as noted in Jimenez, the Gokey defendant had been "arrested for two nonviolent crimes," and the People conceded that the police "merely searched the bag because they suspected it contained drugs" (22 NY3d at 722). Similarly, the detailed decision in People v Boler (106 AD3d 1119 [3d Dept 2013]) gives no indication that the police had any grounds to suspect that the purse on the hood of the defendant's car contained a weapon (as opposed to narcotics). Arizona v Gant (556 US 332 [2009]), to the extent it might have any relevance to the standards for the search of a container outside of a vehicle, is similarly distinguishable (see id. at 335-336 [setting forth the relevant facts]).
While People v Jenkins (24 NY3d 62 [2014], supra) held that exigency could not support a warrantless opening of a closed box that was believed to contain a gun, that case is distinguishable on the ground that, under the circumstances that existed at the time of that search, any weapon in the closed box did not pose a danger to the police or anyone else. In Jenkins, two men suspected of firing a gun from the roof of a building fled from police into an apartment in the building. The police used a sledgehammer to enter the apartment, located and handcuffed the men, placed all of the occupants of the apartment under their control in the living room, and then searched the apartment for the gun. In the course of the search, an officer found a "silver box" on the floor, "picked up the box, shook it, and, upon hearing a sound, opened it and discovered the gun" (id. at 64). The Court held that the warrantless search of the closed box was
not justified by exigent circumstances because, by the time the box was opened, the two suspects had been handcuffed, "the police were in complete control of the house," and no "danger to the public or the police" existed (id. at 65 [internal quotation marks and brackets omitted]). Thus, the result in Jenkins depended not only upon the suspects' lack of access to the box believed to contain a gun, but upon the fact that the box was inside an apartment under the "complete control" of the police. Without danger to themselves or the public, the police could have delayed their search of the box — and, by parity of reasoning, of the entire apartment and its contents — until a warrant had been obtained.
The facts of this case contrast with those of Jenkins. Here, the suspect container was not a closed box but a jacket with open pockets, and the jacket was not located inside of premises under police control but was simply lying on the trunk of a police car parked on the street. If the search could not lawfully be conducted until a warrant was obtained, the police would subject themselves to possible danger from a loose weapon in the pocket of the jacket while transporting it to the precinct station. The only alternative would have been to lock the jacket
in the trunk of the car and to leave the car parked on the street until a warrant to look in the [*9]pockets could be obtained. The majority apparently takes the position that the police were required either (1) to transport the jacket to the station house without first looking in the pockets, thereby incurring the danger of an accident from any loose weapon that might be secreted in the pockets (as one actually was), or, alternatively, (2) to lock the jacket in the car's trunk and to leave the car parked where it was, unavailable for its intended use, for however many hours it would have taken to obtain a warrant. Nothing in Jenkins, where the suspected gun was in a closed box in premises under police control, forces such a choice on police officers facing dissimilar circumstances of the kind that faced the officers in this case.
Looking for a basis for the holding that the police should have abided the likely presence of a weapon in the jacket until they obtained a warrant to look in the pockets, the majority points to the fact that the police witness did not spell out, in haec verba, his obvious concern, based on the conduct that provoked the police to seize defendant (a seizure that the majority does not criticize), that a dangerous instrumentality was secreted in the pockets of the jacket. Thus, the majority
relies, in the end, on the fact that "Officer Svenstrup . . . did not testify that . . . he searched the jacket due to any concern that it might contain a gun or other weapon." This ignores the majority's own recognition, just a few paragraphs before, that, as previously noted, Jimenez establishes that "affirmative testimony is not necessary" to evidence the concern that rendered a search reasonable if the facts in evidence make it obvious that apprehension of an exigency justifying the search was, under the circumstances, objectively reasonable (see Jimenez, 22 NY3d at 723 ["While an officer need not affirmatively testify as to safety concerns to establish exigency, such apprehension must be objectively reasonable"]).
The majority asserts that "even if there had been a legitimate concern, at some earlier time during the encounter between defendant and the police, that defendant might retrieve a weapon from the jacket, that possibility no longer existed at the time the police conducted the search." To reiterate, the presence of a weapon in the jacket was dangerous whether or not defendant could retrieve it at the time of the search. While the majority expresses concern that my position "would eviscerate the grabbable area doctrine," the fact is that not all dangers in the world emanate from a defendant's "grabbable area," and the
doctrine was not intended to restrict the police from addressing those other dangers. Further, contrary to the majority's assertion, nowhere do I suggest that the existence of exigent circumstances should be measured at any time other than that of the search. Here, the exigency of the suspected presence of a loose weapon, which could present a serious danger regardless of defendant's access to it, was present when the police searched the jacket.
The majority mischaractizes my position as being that "whenever there is the possible presence of a weapon, the police can search a container to protect themselves, even if it is nowhere near the suspect's grabbable reach." In fact, I take the position that police can search a container to protect themselves when they reasonably suspect that a weapon is secreted within the container and such a weapon, if not secured, would present a danger to the public or themselves. This is precisely the situation with which the police were presented in this case. Again, I do not see how the jurisprudence of this state requires the police to subject themselves [*10]and the public to the risk of accidental injury that may emanate from an unsecured weapon suspected of being secreted within a container.
In the end, since it cannot deny that the record establishes that defendant's conduct gave the police reason to suspect that the pockets of his jacket contained a weapon, the majority resorts to the position that the danger emanating from such a weapon (regardless of defendant's access to it) could not support a warrantless search of the jacket because the People did not use the phrase "emergency doctrine" in justifying the search. However, it is plain that the People, in defending the search of the jacket, relied, both in the motion court and on appeal, on the reasonable suspicion by the police that a weapon was present in the pockets of the jacket. Since the People did rely on the potential presence of a weapon in the jacket, and the danger of accidental harm from an unsecured weapon is obvious, I believe that the point is preserved. The scenarios I posit are to show the impracticality (at best), and public danger (at worst), following from the majority's position that the police should not have searched the jacket until they obtained a warrant. In so instructing the police, the majority offers no suggestion for what they should have done with the jacket in the interim.
In sum, I believe that defendant's jamming his hands in his jacket pockets while being escorted out of the restaurant, and his resistance to attempts by the police to remove his hands from the pockets, gave the police grounds for reasonable apprehension that a weapon might be present in the jacket, and constituted an exigent circumstance that justified the warrantless search of the jacket after defendant had been subdued, even though he was no longer wearing it. Accordingly, I respectfully dissent and vote to affirm the judgment of conviction and the underlying denial of defendant's motion to suppress the evidence recovered from the jacket.
Judgment, Supreme Court, New York County (Robert M. Stolz, J. at hearing; Bruce Allen, J. at jury trial and sentencing), rendered September 15, 2010, reversed, on the law and the facts, the motion to suppress granted, and the indictment dismissed.
Opinion by Richter, J. All concur except Friedman, J.P. who dissents in an Opinion.
Friedman, J.P., Acosta, Moskowitz, Richter, Clark, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: FEBRUARY 10, 2015
CLERK



Footnotes

Footnote 1: There is no record support for the prosecutor's contention at the suppression hearing that the police gave the jacket back to defendant because it was cold outside. No testimony at the hearing established that defendant asked for his jacket to be returned. Nor was there any evidence that the officers asked defendant if he wanted the jacket back. Indeed, there was no testimony as to why, or even when, the jacket was returned to defendant. Thus, the dehors-the-record weather data gathered by the dissent from an Internet search is simply irrelevant here.

Footnote 2: Although defendant's main brief on appeal does not rely on Jimenez, which was decided after the brief was filed, he properly supports his arguments with cases preceding Jimenez (see Gokey, 60 NY2d at 309; Arizona v Gant, 556 US 332 [2009]).

Footnote 3: The motion court's finding that the jacket was not in the exclusive control of the police cannot be reconciled with the testimony that defendant was handcuffed in the car and numerous police officers were present.

Footnote 4: Even if the People had raised the emergency doctrine on appeal, it would be both unpreserved and beyond this Court's power of review (see People v Concepcion, 17 NY3d 192, 194-195 [2011]; People v Gerard, 94 AD3d 592 [1st Dept 2012]).

Footnote 5:For example, one possible meaning the majority may have in mind when it says that the police is that the officers should have locked the jacket in the trunk of the police car and then driven to the police station and obtained a warrant before searching the pockets. If the police had done this, an impact during the drive to the station might have caused a loaded gun in the jacket to discharge.

Footnote 6:While the prosecutor and the hearing court seem to have focused on the need to search the jacket before returning it to defendant, the jacket was a potential source of danger whether or not it was returned to defendant, given the grounds the police had to suspect that there might be a weapon in the jacket's pockets (as turned out to be the case). Thus, even if the record does not establish that there was a necessity to return the jacket to defendant (as the majority contends), the presence or absence of a need to return the jacket to defendant is of no moment. Certainly, the police cannot be criticized for desiring to return defendant's jacket to him on a February night. While the majority correctly notes that the record is not well developed on this issue, and Officer Svenstrup testified that "[i]t was cold, but not too cold" when defendant was arrested, I observe that an Internet search reveals that, at the time of the arrest (about 9:00 p.m. on February 29, 2008), the temperature and wind chill in New York City were approximately 34§F and 25.5§F, respectively.

Footnote 7:The majority chooses not to discuss defendant's meritless argument that the police "illegally seized [him]" when they grabbed his arms in response to his jamming his hands into his pockets as he was being escorted out of the restaurant. The majority's failure to address this argument (which, as previously noted, is point I of defendant's appellate brief) is telling: the majority cannot deny that the police reasonably perceived danger from defendant's act, but the reasonably perceived danger of the possible presence of a weapon (a danger that was, in fact, actually present) obviously did not disappear simply because defendant had been subdued.

Footnote 8:Notably, the Court of Appeals in Jimenez distinguished its earlier decision in People v Smith (59 NY2d 454 [1983]), in which a search of the defendant's briefcase simultaneous with his arrest for turnstile jumping had been held lawful, on the ground that the Smith defendant "wore a bulletproof vest and denied this fact when questioned by police" (22 NY3d at 722). Thus, the Court pointed to Smith as an example of "[e]xigency . . . deriv[ing] from circumstances other than the nature of the offense" for which the arrest was made (id.). The same can be said of the instant case.