People v J.B. (2024 NY Slip Op 24074)

[*1]

People v J.B.

2024 NY Slip Op 24074

Decided on March 8, 2024

Supreme Court, Bronx County

Stone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 8, 2024
Supreme Court, Bronx County

The People of the State of New York

against
J.B., Defendant.

Ind. No. 70702-23

ADA Rebekah Cohen; ADA JeanPaul Rivera, Office of the Bronx District Attorney, for the People
Elizabeth Bright, Esq.; Aurora Maoz, Esq., The Bronx Defenders, for the Defendant

Audrey E. Stone, J.

The Court conducted a combined Mapp/Huntley/Dunaway hearing on February 9, 2024. For the reasons set forth herein, the motion is granted in part and denied in part. 
Factual Findings
On December 4, 2022, the New York Police Department received two 911 calls for assistance at an apartment located at 3800 Carpenter Avenue: one relating to domestic violence and a second involving a past assault. Police Officer Usman Rayhab testified to the events that unfolded and body worn camera footage memorialized the majority of his testimony. Upon police arrival, they found the defendant, Ms. B., in the hallway of her apartment building. According to Officer Rayhab, Ms. B. sounded out of breath and appeared in trauma by the events of the day. She stated that her boyfriend had threatened her with a gun, that she thought he would kill her, and that she feared for her life. She told the officers that her boyfriend was still in the apartment with the gun. She provided the police with the keys to her apartment and consent for them to enter while she waited outside. Upon entering the apartment, the police found the defendant's boyfriend lying on a bed and immediately arrested him at gunpoint.After arresting the defendant's boyfriend, the police undertook a search for the weapon at issue. 
Outside of the apartment, Officer Rayhab continued to gather information from the defendant. Her behavior was subdued and cooperative. In an apparent effort to separate the [*2]defendant from her boyfriend, the police suggested that Ms. B. move down a flight of stairs where she continued to converse with Officer Rayhab. Throughout these interactions, Ms. B. held two purses. She expressed concern that her phone remained in the apartment, and asked the police to look for her phone, which she thought might be on the bed. Officer Rayhab began to fill out a domestic incident report and there was ongoing discussion about where the police might be able to locate the firearm. At one point, the police asked Ms. B. about a safe that they had observed in the apartment. Stating that she did not have information on how to open the safe, she gave the police permission to take the safe in order to further search for the gun in question. 
Inside of the apartment, the police encountered an unkempt environment. They found ten dogs held in numerous crates. The windows in the apartment were closed limiting ventilation of a putrid odor. Officer Rayhab described the cages as filthy with feces and no water or food. Body worn camera footage corroborated that at least one dog seemed to be breathing with difficulty. Confronted with the unsettling appearance and smell from the animals, the police contacted the ASPCA for guidance. 
Back outside in the hallway, the police pivoted from an investigation into the domestic violence to the medical condition of the wheezing dog and to who owned the dogs and cared for them. During this questioning, Ms. B. explained that part of the reason for her boyfriend's assaultive conduct related to the fact that Sundays are when the parties cleaned the crates and apartment. At an earlier point of time, the defendant had explained that her boyfriend's menacing arose out of his anger that the bleach had been finished. 
At this juncture, the police summarily arrested the defendant for animal cruelty. The defendant expressed disbelief as the police handcuffed her and commenced a search of her person. During this process, one of the officers removed Ms. B.'s two handbags and conducted an independent search. While searching her yellow purse, the officer found a zip lock bag containing a small gun. Upon this discovery, everyone present, including the defendant, reacted with apparent surprise. In fact, one officer shouts out to Ms. B. in anger and disbelief that she has a "fucking gun." 
Following her arrest, Ms. B. was transported to the 47th precinct. After processing and approximately four hours of waiting, the defendant was questioned by the police. This interview was memorialized by video and admitted into evidence. Detective Gove, in the presence of Officer Rayhab, administered Miranda warnings. After the defendant waived her rights, Detective Gove briefly interrogated the defendant. She denied any knowledge that the weapon had been in her purse. 
Legal Conclusions
At a hearing challenging the legality of the defendant's search and seizure, the People bear the burden of going forward to demonstrate the legality of the police conduct in the first instance after which the defendant bears the ultimate burden of proving illegality (People v Berrios, 28 NY2d 361, 367 [1971]). Here, the basis for the defendant's arrest was the officers' belief that the defendant committed "animal cruelty," in other words, that she had violated Section 353 of New York State's Agriculture and Markets Law (see AML § 353). AML § 353 penalizes animal cruelty as relevant here by depriving animals of sustenance or allowing an animal to suffer torture. The Court finds the police here had a sufficient basis to establish probable cause for an arrest under this provision. The police reacted to a foul smell arising out of the apartment's filth. The animal crates lacked food and water and the responding officers did [*3]not see dog food in the apartment. While there was no indication that the dogs had been systemically underfed or tortured, or that the ill health of the one wheezing dog arose from extreme medical neglect, the minimal standard of probable cause had been met. Probable cause requires only a reasonable belief that a crime is being committed (see People v McRay, 51 NY2d 594, 602 [1980] ["Probable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction, but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed"]).
Yet, while a summary arrest can be legally supported, the police had many options beyond what transpired. Under AML § 371, a police officer "must . . . issue an appearance ticket . . . summon or arrest . . . any person offending against any of the provisions of article twenty-six of the agriculture and markets law," which includes AML § 353. While AML § 371 requires an officer to act, it does not deprive an officer of all discretion (see All. to End Chickens as Kaporos v New York City Police Dep't, 152 AD3d 113, 119-20 [1st Dept. 2017], aff'd, 32 NY3d 1091 [2018]). Procedure 212-119 of the New York City Police Department Patrol Guide sets out the processes for investigating a complaint of animal abuse under AML §§ 353 and 371. The guidance states that the police may issue a Desk Appearance Ticket (necessitating an arrest under New York City Police Department Patrol Guide Procedure No. 208-27) or a summons (which would not necessitate an arrest under New York City Police Department Patrol Guide Procedure No. 209-09). The guidance sets out options for enforcement and specifically allows that "[i]f the ends of justice will not be met by taking enforcement action" the police can notify ASPCA and close out the case (see New York City Police Department Patrol Guide Procedure No. 212-119). In sum, the police conduct here while lawful was not required (People v Lewis, 50 AD3d 595, 595 [1st Dept. 2008], lv denied 11 NY3d 790 [2008] [holding that the fact that an officer could have issued a summons in lieu of arresting the defendant is not a basis for suppression]).
On the other hand, the arrest of the defendant's boyfriend was mandatory under CPL § 140.10(4)(a). A known citizen complainant informed the police that her boyfriend had menaced her with a firearm, a potential violation of, amongst other charges, Penal Law § 265.03(1)(b), a Class C felony. By arresting both parties a paradoxical dilemma arose. For both parties, the right to counsel attached meaning that the police were legally limited in their ability to interview the defendant as to her alleged victimization (see People v Dunbar, 24 NY3d 304, 313-14 [2014]). So called "cross-complaints" in domestic violence situations have been recognized as representing a deterrent to reporting (see Lisa Fischel-Wolovick, Police Response: Mandatory Arrest & Primary Physical Aggressor, Lawyer's Manual on Domestic Violence 6th ed [2015] at 53-54). After enactment of CPL § 140.10(4)(a), the legislature modified the law to require a primary aggressor analysis before arresting both parties (see CPL § 140.10[4][c]). While the defendant's arrest here was not for an offense against her boyfriend, the reasoning behind CPL § 140.10(4)(c) could have informed the police action that occurred. 
In this situation, the defendant faced several known factors increasing the risk to her physical safety. The danger of lethality to intimate partners from gun violence raises the potential of homicide (see Jane K. Stoever, Firearms and Domestic Violence Fatalities: Preventable Deaths, 53 Fam L Q 183, 186 [2019], citing Jacquelyn C. Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multistate Case Control Study, 93 Am J Pub Health 1089, 1090 [2003] [noting that the risk of femicide raises by 500% when an [*4]abusive partner has access to a firearm]). 
Animal abuse represents another factor closely associated with risk in an intimate partner violence relationship (see Michelle Clear et al., Animal abuse in the context of adult intimate partner violence: A systematic review, available at https://www.sciencedirect.com/science/article/pii/S1359178921001300?via%3Dihub [last accessed March 7, 2024] [noting that 41% of abusers of pets were previously arrested for intimate partner violence at least once]). According to one study, women in domestic violence shelters were 11 times more likely to report that their partner had harmed a pet than women who had not experienced intimate partner violence (see National Coalition Against Domestic Violence, Pets & Domestic Violence, available at https://assets.speakcdn.com/assets/2497/pets_and_dv.pdf [last accessed March 7, 2024]).
Further, the defendant feared that her boyfriend would kill her and informed the police that he had threatened to do so. Threats to kill are a recognized lethality factor in intimate partner violence relationships (see Jacquelyn C. Campbell et al., The Danger Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide, available at https://www.dangerassessment.org/uploads/DA_Validation_of_a_Lethality_Risk_Assessment_Instrument-Campbell.pdf [last accessed March 5, 2024]). A victim's belief that an abuser will kill her has also been correlated with a risk of lethality (see Laura Johnson et al., Do You Believe Your Partner is Capable of Killing You? An Examination of Female IPV Survivors' Perceptions of Fatality Risk Indicators, Journal of Interpersonal Violence, Vol 37, Issue 1-2, available at https://journals.sagepub.com/doi/epub/10.1177/0886260520916273 [last accessed March 7, 2024] [finding that 78.4% of survivors believed that their abuser was capable of killing them]). New York State's domestic incident reports ("DIRs") specifically assess whether a suspect has threatened to kill a victim or the victim's children and whether a victim has a subjective fear of being killed (see New York State Standardized Domestic Incident Report, available at https://www.criminaljustice.ny.gov/ojis/documents/dir.pdf [last accessed March 7, 2024]).
Considering the factors indicating an extreme risk to the defendant from the reported domestic violence and the discretion that the police had in investigating and responding to the overall situation, the Court finds the police response lacking. The police action in placing the defendant into immediate custody exacerbated the risk of future domestic violence of a serious nature. Best practice in this scenario would have involved a referral for domestic violence services and a more thorough investigation into the alleged animal cruelty before execution of a summary arrest.[FN1]
 
However, as stated supra, the Court finds the defendant's arrest lawful. Therefore, the question turns to whether the warrantless search of the defendant's purse leading to the discovery of a gun was proper. As stated by the Court of Appeals, "All warrantless searches presumptively are unreasonable per se, and, thus, [w]here a warrant has not been obtained, it is the People who have the burden of overcoming this presumption of unreasonableness" (People v Jimenez, 22 [*5]NY3d 717, 721 [2014] [internal quotation marks and citations omitted]). 
New York law affords greater protection against searches of containers incident to arrest than federal law (see People v Gokey, 60 NY2d 309, 312 [1983]). "Under the State Constitution, an individual's right of privacy in his or her effects dictates that a warrantless search incident to arrest be deemed unreasonable unless justified by the presence of exigent circumstances" (Gokey, 60 NY2d at 312). The requisite exigency may arise from the need to ensure the safety of the public and the arresting officers, or the protection of evidence from destruction or concealment (id.).
Here, it is undisputed that, after arresting the defendant for allegedly violating AML § 353, the officers searched her purses incident to arrest without a warrant. Accordingly, to be legal, the search required the support of an exigency. Courts considering the issue of whether an exigency existed to support a warrantless search incident to arrest have considered as factors, among others, the nature of the offense for which the person was pursued or arrested, the presence of other officers on scene, and the defendant's behavior leading up to and during the search (see e.g. Jimenez, 22 NY3d 722-723; Gokey, 60 NY2d at 313; People v Hinton, 148 AD3d 545, 546 [1st Dept. 2017], lv denied 29 NY3d 1080 [2017]; People v Morales, 126 AD3d 43, 47 [1st Dept. 2015]; People v Julio, 245 AD2d 158, 158-159 [1st 1997], lv denied 91 NY2d 945 [1998]; People v Crosse, 197 AD3d 792, 796 [3d Dept. 2021]). Here, none of these factors exist. The defendant was arrested for a non-violent offense relating to the care of her dogs, the defendant was calm and cooperative throughout the entirety of the police encounter including her arrest, and the large number of officers present militated any risk to officer safety. Lacking any factor in support of finding exigent circumstances, the Court finds the warrantless search of the defendant's purse to be in violation of the New York State Constitution (Gokey, 60 NY2d at 312). 
To overcome the absence of an exigency, the People have argued, in the alternative, that the firearm's recovery may be upheld under the inevitable discovery doctrine. Under the doctrine of inevitable discovery, "courts have refused to suppress evidence if it can be shown by 'a very high degree of probability' that the evidence sought to be suppressed would inevitably have been discovered irrespective of the initial wrong" (People v Stith, 69 NY2d 313, 318 [1987] [internal citations omitted]). Nevertheless, under New York law, primary evidence recovered from a search remains subject to exclusion (People v Turriago, 90 NY2d 77, 86 [1997]).
Here, the recovered firearm is primary evidence, since its recovery resulted directly from the illegal search of the defendant's purse (Turriago, 90 NY2d at 86; Stith, 69 NY2d at 318). Similar to the case at bar is People v Vega (256 AD2d 730, 731-732 [3d Dept 1998], lv denied 93 NY2d 858 [1999]). In Vega, police recovered a firearm in a search of a defendant's bag incident to arrest for driving while ability impaired. Like Vega, officers recovered the firearm by searching a separate bag following an arrest for a non-violent offense. Thus, the Court holds the doctrine of inevitable discovery inapplicable. Accordingly, the Court grants the defendant's motion to suppress the firearm recovered by the police. 
The Court now addresses the defendant's motion to suppress her video statement. "The relevant issue on a Huntley suppression hearing is whether if the statement was made, it was made either involuntarily or without appropriate Miranda procedures" (People v Williams, 73 AD2d 584, 585 [1st Dept. 1979]). The People bear the burden of proving a statement voluntary beyond a reasonable doubt (see People v Witherspoon, 66 NY2d 973, 974 [1985]).
The video recording of the defendant's statement establishes beyond a reasonable doubt [*6]that the defendant knowingly, intelligently, and voluntarily waived her Miranda rights (People v Williams, 62 NY2d 285, 288 [1984]), and that the officers did nothing during the interrogation that overbore her will or otherwise rendered the statement involuntary (People v Jin Cheng Lin, 26 NY3d 701, 719 [2016]). In addition, the statement is not the fruit of an unlawful arrest (Dunaway v New York, 442 US 200, 219 [1979]). For the reasons stated above, the arrest was not without probable cause.
Accordingly, the Court denies the defendant's motion to suppress the video statement and grants suppression of the recovered firearm.
This constitutes the decision and order of the Court.
Dated: March 8, 2024
Bronx, New York
Audrey E. Stone, A.J.S.C.

Footnotes

Footnote 1: For example, under the Lethality Assessment Program, officers work collaboratively with victims and service providers, from the moment of responding to the scene, to assess the severity of risk faced by a victim and connect the victim to services (see D. Kelly Weisberg, Lethality Assessment: An Impressive Development in Domestic Violence Law in the Past 30 Years, 30 Hastings Women's L J 211, 222-227 [2019]).